IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MARY DYSIE, etc., | ) |
| | ) |
| Plaintiff | ) |
| | )   CASE NO. CV03-HGD-1030-S |
| vs. | ) |
| | ) |
| FAMILY LIFE INSURANCE CO., | ) |
| | ) |
| Defendant | ) |

**MEMORANDUM OPINION**

The above-entitled civil action is before the court on the motion for partial summary judgment filed by plaintiff, Mary Dysie [Doc. #19], and the motion for summary judgment filed by defendant, Family Life Insurance Company [Doc. #26]. This case is before the undersigned magistrate judge on the consent of the parties, in accordance with 28 U.S.C. § 636(c) and the General Order of Reference regarding such matters in the Northern District of Alabama.

This case was filed initially in Jefferson County Circuit Court but was removed to federal court by defendant, pursuant to 28 U.S.C. § 1332. (*See* Doc. #1, Notice of Removal). It concerns a life insurance policy issued by defendant in 1992. Plaintiff alleges, in her Amended Complaint, fraud (Count One) and a bad faith refusal to pay benefits (Count Three), and requests reformation of the insurance contract (Count Two). In her motion for

partial summary judgment, plaintiff seeks judgment in her favor with regard to her claim for reformation of the contract of insurance that is the basis of this litigation. Defendant, Family Life Insurance Company (Family Life), opposes plaintiff's motion for partial summary judgment and seeks judgment in its favor as a matter of law as to all of plaintiff's claims. Both parties have filed briefs and evidentiary submissions with respect to the motions, and the motions are ready for disposition. Subsequent to the filing of these motions, plaintiff filed a second amended complaint, discussed *infra*.

### SUMMARY JUDGMENT STANDARD

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is under this standard that the court must determine whether the plaintiff can meet her burden of coming forward with sufficient evidence as to each material element of her claim sufficient to permit a reasonable jury to find in her favor.

Put succinctly, in order to succeed on her motion for partial summary judgment, plaintiff must establish that each material element necessary to obtain reformation of the underlying contract of insurance exists as a matter of law. *Liberty Lobby, supra.* In order to succeed on its motion for summary judgment as to all claims, defendant must demonstrate that plaintiff cannot make a showing sufficient to establish the existence of at least one element essential to each of her claims on which the she will bear the burden of proof at trial. *Celotex, supra.*

### DISCUSSION

**Undisputed or Uncontradicted Facts**

Plaintiff, Mary Dysie, is currently a resident of Birmingham, Alabama, and the daughter of the late Tonsie L. Dysie. In 1992, Tonsie Dysie lived alone at a home located at 28 Center Place in Birmingham. Ms. Dysie was working as a housekeeper and child care assistant in the home of Robert Schnall in Queens, New York, at that time. Mr. Dysie had a third-grade education and could neither read nor write. From the time her mother died in 1986, Ms. Dysie had been assisting her father by sending him money orders on a monthly basis to help him pay the mortgage on his home.

On or about February 1, 1992, while working at the Schnalls' residence in New York, Ms. Dysie received a telephone call from her father in Alabama. He told her that an insurance agent was at his home who wanted to talk to her about an insurance policy on his

life that would satisfy the mortgage on his house if he should die before the mortgage was paid in full. Ms. Dysie told her that, if he wanted to buy this insurance, it was fine with her.

After Ms. Dysie spoke briefly to her father, an insurance agent for Family Life, later identified as Clarice Snelling, spoke telephonically with Ms. Dysie. Ms. Snelling told Ms. Dysie that the premiums for the life insurance on Mr. Dysie would be paid with the monthly mortgage payment. Further, she told Ms. Dysie that her father wanted the insurance because it would satisfy the mortgage on the home if he should die before the house was paid off.

On February 1, 1992, a temporary life insurance agreement was issued by Family Life through Ms. Snelling listing Tonsie Lee Dysie as the "proposed insured" and Mary L. Dysie as an "additional insured." (Doc. #21, at Plaintiff's Exhibit B, Temporary Life Insurance Agreement). However, on or about March 1, 1992, Family Life issued a life insurance policy in the amount of $50,000 naming only Mary Dysie as the insured. (Doc. #21, at Plaintiff's Exhibit C, Life Insurance Policy issued by Family Life Insurance Company). The policy was mailed to Tonsie Dysie at the 28 Center Place address in Birmingham, but the policy was not mailed to Mary Dysie in New York.

In 1998, Ms. Dysie left her employment in New York and moved back to Alabama to live with her father in order to help care for him. Mr. Dysie had numerous ailments, including diabetes, kidney failure, high blood pressure, and a history of strokes. After the conversation in 1992, Ms. Dysie had no further conversations with her father concerning the insurance until January 2001 when he was very sick and hospitalized. At this time, shortly

5

before his death, Mr. Dysie told Ms. Dysie that he had purchased the Family Life policy, that it would satisfy the mortgage if he died, and that he did not want her to worry about paying the mortgage because of all that she had done for him. He further advised her that it was his turn to do something for her and that the life insurance policy was it. Ms. Dysie's sister, Rosa Foster, and Rosa's husband, Larry Foster, also were present and heard this conversation.

Tonsie Lee Dysie died on January 13, 2001. (*See* Doc. #21, at Plaintiff's Exhibit D, Alabama Certificate of Death). A few days after the death of her father, Mary Dysie found the Family Life Insurance policy at her father's home. (Dysie Depo. at 98-99). After the policy was located, Ms. Dysie's brother-in-law called Family Life to inform them that Mr. Dysie had died and to determine what needed to be done with regard to the policy. Mr. Foster was informed that the policy insured the life of Mary Dysie, not Tonsie Dysie.

Donna Calderon, a senior claims examiner for Family Life, testified that she answered the phone call from Larry Foster on January 16, 2001. (Doc. #21, at Plaintiff's Exhibit H, Calderon Depo., at 4-6). She stated that he was reporting the death of Tonsie Dysie. (*Id.* at 6). After receiving the policy number from Mr. Foster, she determined that the policy was on the life of Mary Dysie, not Tonsie Dysie. Mr. Foster stated that he thought the policy was on Tonsie Dysie. (*Id.*). Ms. Calderon told Mr. Foster that the issue would have to be researched and that Ms. Dysie would get a call back. (*Id.* at 6-7). At that time, Ms. Calderon wrote up a document titled "Notification of Death by Phone" which notes that Larry Foster

had notified Family Life of the death of Tonsie Dysie. On the note, Ms. Calderon wrote "Please research & call Mary back." (Doc. #21, at Plaintiff's Exhibit K, Olga Conyers (Family Life Manager) Depo., at 12-13).

Barbara Mitschke, a Family Life claims examiner, testified that on January 17, 2001, she received a second phone call from Larry Foster. (Doc. #21, at Plaintiff's Exhibit I, Mitschke Depo., at 4-9). He wanted to talk to her about the policy, but she told him that she would have to have Ms. Dysie's permission before she could speak with him. (*Id.* at 10-11). Although Family Life acknowledges that it received these phone calls from Larry Foster, a file never was opened regarding Tonsie Dysie nor did anyone from Family Life ever call Mary Dysie back to talk to her about the insurance policy referenced in the phone calls from Mr. Foster. (Doc. #21, at Plaintiff's Exhibit J, Maria Lopez (Family Life Senior Claims Examiner) Depo., at 4, 6-8).

According to Ms. Dysie, her signature was forged on the application for insurance with Family Life. (See Dysie Depo. at 109-13, 120; Doc. #21, at Plaintiff's Exhibit E, Application for Insurance dated February 16, 1992). This application listed Mary Dysie's address as 28 Center Place South in Birmingham, although she was living in New York at that time. It also incorrectly listed her father's telephone number in Birmingham as her home phone number but correctly listed the Schnalls' home phone number in New York as her "business" number. It also incorrectly listed her occupation as an accounting clerk. (*Id.*). Ms. Dysie never has worked as an accounting clerk. In addition, it lists her physician as Dr.

Ron Kitinger, 7 Huddle Drive, Birmingham, Alabama. (*Id.*). Ms. Dysie does not know this person, and he is not her physician.

Ms. Dysie's signature also was forged on the temporary life insurance agreement issued on February 15, 1992, showing her as the proposed insured. (Doc. #21, at Plaintiff's Exhibit F, Temporary Life Insurance Agreement). Ms. Dysie was never sent a copy of the life insurance policy indicating that she was the insured. (Dysie Depo. at 112-13).

**Fraud Claim**

The elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) hat caused damage as a proximate consequence. *Brushwitz v. Ezell*, 757 So.2d 423, 429 (Ala. 2000).

Viewed in the light most favorable to the non-moving party (in this case, plaintiff), there is evidence which could cause a reasonable jury to believe that Snelling took advantage of Tonsie Dysie's illiteracy and misled Tonsie and Mary Dysie regarding the named insured on the policy of insurance.

Since there appears to be no claim to the contrary, the court assumes that Snelling was a general agent for Family Life. A "general agent" is one who has authority to transact all of the business of the principal, of a particular kind, or in a particular case. The powers of such an agent are coextensive with the business entrusted to his care, authorizing him to act for the principal in all matters coming within the usual and ordinary scope and character of

such business.  A general agent has full power to bind the insurer to the agent's contract of insurance or to issue policies or to accept risks.  In fact, a general agent "stands in the shoes" of the principal for the purpose of transacting business entrusted to him.  Since a general agent's powers are coextensive with the business entrusted to him, his fraudulent act is the fraudulent act of his insurer principal as well.  *Washington Nat. Ins. Co. v. Strickland*, 491 So.2d 872, 874 (Ala. 1985) (citing *Southern States Fire Ins. Co. v. Kronenberg*, 74 So. 63, 67 (1917), and *McGhee v. Paramount Life Ins. Co.*, 385 So.2d 969 (Ala. 1980)).

There are genuine issues of material fact which must be resolved regarding plaintiff's claim of fraud against Family Life for which summary disposition is inappropriate.  Therefore, defendant's motion for summary judgment with regard to plaintiff's claim of fraud is due to be denied.

**Contract Reformation**

Under Alabama law, *Ala. Code* § 8-1-2 (1975) is the sole means by which a court is to adjudicate the interests of parties in the reformation of a written contract.  *Irvin v. Griffin Corp.*, 808 F.2d 802 (11th Cir. 1987).  That code section provides:

> When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.

*Ala. Code* § 8-1-2 (1975).

Plaintiff asserts that the undisputed evidence is sufficient to mandate a reformation of the contract of insurance as a matter of law to reflect Tonsie Dysie as the named insured, rather than Mary Dysie. However, according to defendant, plaintiff's reformation claim is barred because there was never a contract between Tonsie Dysie and defendant, only between Mary Dysie and defendant. Neither claim is correct.

The temporary life insurance agreement issued on February 1, 1992, lists Tonsie Dysie as the proposed insured and Mary Dysie as an additional insured. The application for insurance, dated February 16, 1992, and submitted to Family Life, clearly lists only Mary Dysie as the named insured. Because the application submitted to Family Life lists Mary Dysie as the insured, there is no evidence that Family Life mistakenly issued the policy in her name rather than in the name of Tonsie Dysie. In addition, given the fact that the temporary insurance agreement and the application both contain the forged signature of Mary Dysie and the application also contains other incorrect information about her, there is evidence of fraud.

The parties to whatever contract may have been negotiated were Tonsie Dysie and Clarice Snelling. Snelling was, at that time, an agent for Family Life. Plaintiff has presented evidence of the negotiations that occurred between Tonsie Dysie and Snelling on or about the day the temporary life insurance agreement was issued. That agreement was signed by Tonsie Dysie and Snelling. As noted above, this document also contains the forged signature of Mary Dysie as an "additional insured."

According to Mary Dysie, she spoke with Snelling on February 1, 1992, and Snelling represented to her that she was going to insure her father's life so that the house would be paid off in the event of his death. Mary Dysie also engaged in conversations with her father on that day and others in which he advised her that this policy was on his life. The Alabama Supreme Court, in *Alabama Farm Bureau Ins. Co. v. Hunt*, 519 So.2d 480 (Ala. 1987), stated:

> "It is practically the universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had. The nature of the action is such that it is outside the field of operation of the parol evidence rule, since the court does not receive parol testimony to vary the contract of the parties but to show what their contract really was. If the rule were otherwise and parol evidence was not admissible in an action for reformation, a rule adopted by the courts as a protection against fraud and false swearing--that is, the parol evidence rule--would become the instrument of the very fraud it was designed to prevent, and the reformation or correction of a written instrument would rarely, if ever, be accomplished. Evidence of fraud or mistake is seldom found in the instrument itself, and unless parol evidence may be admitted for the purpose of procuring its reformation, the aggrieved party would have as little hope of redress in a court of equity as in a court of law...."

*Id.* at 485 (quoting 66 Am.Jur.2d Reformation of Instruments § 118, at 644-45 (1973)). See also *Floyd v. Andress*, 246 Ala. 301, 20 So.2d 331 (1944). Therefore, Tonsie Dysie's statements are admissible as evidence of the true intent of the parties.

11

In addition, Tonsie Dysie could neither read nor write. Therefore, the fact that the application for insurance, dated February 16, 1992, contained only Mary Dysie's name as the proposed insured, rather than the name of Tonsie Dysie, does not clearly establish that the intention of the parties was that Mary Dysie was to be the only named insured. The application contains the forged signature of and other falsified information concerning Mary Dysie, and it apparently was filled out in Alabama at a time when Mary Dysie was living in New York. Because Tonsie Dysie could neither read nor write, the fact that incorrect information was being submitted would have been unknown to him, even assuming that he participated in filling out the application in any way.

On the other hand, Mary Dysie moved back to Alabama in 1998 and began living with her father at his residence. There is evidence that Family Life regularly sent statements to Tonsie Dysie's address listing Mary Dysie as the named insured both before and after Mary Dysie returned to Alabama. Mary Dysie testified that she checked and read the mail because of her father's illiteracy. However, she denies having seen any of these statements and states she was not aware of them until they were discovered in the house after her father's death. (Dysie Depo. at 73-74, 101-06).

The facts presented leave open a wide range of possibilities. For instance, Ms. Snelling may have taken advantage of Tonsie Dysie's illiteracy and told him she was writing a policy on his life while actually writing it on the life of Mary Dysie. The scenario has some

credibility based on the forging of Mary Dysie's signature and the input of false information regarding Mary Dysie on the application for insurance.

It is also possible that Mary Dysie was the intended insured all along. It would have made sense to insure her life because she was making the payments on her father's house. If she were to have died before him, he would have been unable to keep up the payments, thus risking the loss of his home. This, of course, does not explain the forged signatures on the application. However, despite this, if a jury believed that Mary Dysie became aware, in 1999 or later, that she was the named insured and did nothing to bring it to the attention of Family Life, this may be construed as evidence that she knew she was the named insured all along or, in the alternative, she may be barred from objecting based on the statute of limitations for fraud.[1]

There are undoubtably other plausible scenarios which could explain the strange sequence of events which occurred here. Those noted above are merely examples meant to illustrate the court's ultimate conclusion that there are material issues of fact which prevent reformation of the contract of insurance at the summary judgment phase of this litigation. It will be up to a jury to determine (1) if fraud on the part of Snelling caused Mary Dysie to be listed as the named insured on the policy, rather than Tonsie Dysie and, if so, (2) whether Mary Dysie became aware of it after she moved in with her father in 1998 and failed to act

---

[1] There is a two-year statute of limitations for fraud claims in Alabama, and the limitations period begins to run when the plaintiff discovers or reasonably should have discovered the facts constituting the fraud. *Ala. Code* § 6-2-3 (1984).

13

such that she is now barred from proceeding by the running of the statute of limitations for fraud. *Nichols v. Life Ins. Co. of Georgia*, 701 So.2d 1126, 1130 (Ala.Civ.App. 1997).

Therefore, because there are material issues of fact to be resolved by a jury, plaintiff's motion for summary judgment on her demand for reformation of the contract of insurance is due to be denied. Likewise, defendant's motion for summary judgment regarding this claim is also due to be denied.

**Bad Faith Claim**

Under Alabama law, the tort of bad faith refusal to pay under a contract of insurance requires: (1) an insurance contract between the parties, (2) an intentional refusal to pay the insured's claim, (3) the absence of any reasonably legitimate or arguable reason for that refusal, and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason. *National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982).

Family Life certainly had an arguably legitimate reason for not paying on this policy when the person who was the named insured, Mary Dysie, was not deceased. Although it is conceivable that the policy at issue could be revised in future proceedings related to this case to reflect Tonsie Dysie as the named insured, Family Life, at the time of its refusal to pay, did not have a policy in the name of Tonsie Dysie. It is difficult to imagine a better reason for an insurance company to refuse to pay a claim. The fact that Family Life may have been misled by its own agent is irrelevant. A bad faith refusal to pay requires *actual* knowledge of the absence of any arguable basis for not paying a claim. Therefore,

defendant's motion for summary judgment is due to be granted with respect to plaintiff's claim for bad faith.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 7th day of February, 2005.

                                                HARWELL G. DAVIS, III
                                        UNITED STATES MAGISTRATE JUDGE